**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**VISION FOR CHILDREN, INC.,**

                                **Plaintiff,**

**v.**                                                    **1:15-CV-0164 (BKS/DJS)**

**CITY OF KINGSTON, NEW YORK,**
**ANDREW ZWEBEN, DAVID ALLEN,**
**JOSEPH HAPPENY, SHAYNE GALLO,**
**WILLIAM CAREY, JAMES NOBLE,**
**DEBORAH BROWN, and TROY**
**ASHDOWN,**

                                **Defendants.**
_____

**Appearances:**

For Plaintiff:
**Robert N. Isseks**
Office of Robert N. Isseks
6 North Street
Middletown, NY 10940

**Kevin D. Bloom**
Bloom & Bloom, PC
530 Blooming Grove Turnpike
New Windsor, NY 12553

For Defendants City of Kingston, Zweben, Allen,
Gallo, Carey, Noble, Brown, and Ashdown:
**Robert D. Cook**
Cook, Netter, Cloonan, Kurtz & Murphy, P.C.
85 Main Street, P.O. Box 3939
Kingston, NY 12401

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.    **INTRODUCTION**

Plaintiff Vision for Children, Inc. brings this action against Defendant City of Kingston, New York, City officials Andrew Zweben, David Allen, Shayne Gallo, William Carey, James Noble, Deborah Brown, and Troy Ashdown (collectively the "City Defendants") and Joseph Happeny, asserting constitutional, statutory, and state law claims related to the City's allegedly unlawful demolition of a building Plaintiff owned and intended to repair and turn into a Christian ministry for orphan children.  (Dkt. No. 24).  Currently pending before the Court are the City Defendants' motion for summary judgment and Plaintiff's opposition and cross-motion for partial summary judgment.  (Dkt. Nos. 36, 37).  The City Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied, for the reasons that follow.

II.    **BACKGROUND**[1]

A.    **The Property**

Prior to the spring of 2014, and for many years, the property at 72 Garden Street in Kingston, New York was owned by Theodore, Barry, and Marcy Perlmutter.  (Dkt. No. 36-1, ¶ 3).  The property consisted of a three story, five-unit apartment building, a three-car garage, a paved driveway, and a three-car paved parking area.  (Dkt. No. 38, ¶ 7).  For a number of years, and in particular 2013 and 2014, the City's Building Safety Division received numerous complaints about the deteriorating condition of the premises at 72 Garden Street and concerns of adjoining property owners for the safety of their property and person.  (Dkt. No. 36-1, ¶ 6).  On October 14, 2008 and again on January 20, 2009, the Building Safety Division of the City Fire

---

[1] The facts stated herein are drawn from the parties' submissions, including Defendants' Statement of Material Facts, Dkt. No. 36-1; Plaintiff's Rule 7.1 Statement, Dkt. No. 38; Plaintiff's Response to Defendants' Statement of Material Facts, Dkt. No. 39; and the exhibits the parties have submitted, to the extent that they are admissible as evidence.  Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

Department posted the premises as unsafe.  (*Id.*, ¶ 4).  On January 25, 2012, the entire structure was posted as unsafe.  (*Id.*).  In March of 2013, the City Fire Department marked the structure at 72 Garden Street with a red "X," indicating that the building was too dangerous to be entered in the event of a fire.  (*Id.*, ¶ 5).

> **B.     City Procedure for Repair or Removal of Unsafe Buildings**

Under the City's municipal code, "unsafe buildings" are defined as follows:

> All buildings or structures which are structurally unsafe, unsanitary or not provided with adequate egress, or which constitute a fire hazard or are otherwise dangerous to human life, health or the safety of the public, or which in relation to existing use constitute a hazard to safety or health by reason of inadequate maintenance, dilapidation, obsolescence or abandonment.

(*See* Kingston City Code §178-1, Dkt. No. 36-3, p. 18).  All unsafe buildings must be abated by repair and rehabilitation or by demolition.  The City Code provides:

A. All unsafe buildings are hereby declared to be illegal and shall be abated by repair and rehabilitation or by demolition in accordance with the procedure of this section.

B. The Fire Officer shall inspect or cause to be inspected every reported unsafe building.

C. Whenever the Fire Officer shall find any building or structure or portion thereof to be an unsafe building, the Fire Officer shall serve or cause to be served upon the owner and any lien holder of the property, a notice as provided herein. Service of said notice can be effected upon the owner or lien holder either personally or by registered mail, addressed to his or her last known address, as shown on the records of the Tax Assessor, and/or in the records in the office of the County Clerk, or in the records of the Kingston Fire Department Building Safety Division. . . . The notice shall contain a description of the premises, a statement describing the specific unsafe condition and an order of the Fire Officer requiring that the building or structure be repaired or removed within a stated time.  The notice shall also specify the date, time and place of a hearing to be held with respect to the order to repair and/or remove the structure.  The notice shall be served no less than 20 days prior to the date of the hearing provided therein.  If such notice is made by registered mail, the Fire Officer shall conspicuously post a copy of such notice on the premises.

D.  The owner and any lien holder shall have 30 days within which to provide the
    Fire Officer with acceptable plans to remedy the unsafe building and obtain a
    permit for said plans; or to submit plans and obtain a permit for the removal of the
    unsafe building.  Upon issuance of the building permit, work must commence
    within 15 days from the issuance thereof and be completed within six months
    from issuance of the permit.  The County Clerk of Ulster County shall mark such
    notice and record or docket thereof as canceled upon presentation and filing of
    such consent or of a certified copy of such order.

E.  The Fire Officer shall file or cause to be filed a copy of the notice . . . in the office
    of the County Clerk of Ulster County, which notice shall be filed by such Clerk in
    the same manner as a notice of pendency as provided by said Clerk, except as
    otherwise hereinafter provided in this subsection.  A notice so filed shall be
    effective for a period of one year from the date of filing; provided, however, that
    it may be vacated upon the order of a judge or justice of a court of record or upon
    the consent of the Corporation Counsel of the City of Kingston.

F.  Such owner shall have the right to a hearing with respect to the notice to repair or
    remove before the Deputy Chief in charge of the City of Kingston Fire
    Department Building Safety Division at a time and place specified in the notice to
    repair and remove.

G.  The decision of the Deputy Chief in charge of the City of Kingston Building
    Safety Division may be appealed to the Chief of the Kingston Fire Department.  A
    request for an appeal shall be served upon the Chief of the Kingston Fire
    Department, the Corporation Counsel of the City of Kingston and upon the
    Deputy Chief in charge of the City of Kingston Fire Department Building Safety
    Division, and the City Clerk within 10 days from the date of the notice of
    determination made following the hearing.  The appeal shall not be a trial de
    novo, but the parties shall have the right to present such additional written
    evidence or argument as they desire.  The Fire Chief shall have the right to
    request such additional evidence as the Fire Chief deems necessary to make a
    decision.

H.  If a determination is made following the hearing and the appeal, if any, that the
    building or structure is an unsafe building and the owner or lien holder fails or
    refuses to comply with the order to repair or remove within 30 days from the date
    of the determination of the Deputy Chief in charge of the City of Kingston Fire
    Department Building Safety Division or the Fire Chief in the event of an appeal to
    the Fire Chief, the City of Kingston may proceed to remove the unsafe building.

I.  All costs and expenses incurred by the City of Kingston in connection with the
    proceeding to repair or remove the unsafe building, including but not limited to
    the cost of actually removing the unsafe building and the disposal of the material
    so removed, shall be assessed against the land on which the unsafe building is
    located.

J.  If the Fire Officer finds that there is actual and immediate danger of failure or collapse so as to endanger life, such notice shall also require the building structure or portion thereof to be vacated forthwith and not reoccupied until the specific repairs and improvements are completed, inspected and approved by the Fire Officer. The Fire Officer shall cause to be posted at each entrance to such building a notice: "This building is unsafe and its use or occupancy has been prohibited by the Building Safety Division." Such notice shall remain posted until the required repairs are made or demolition is completed. It shall be unlawful for any person, firm or corporation, or their agents or other servants, to remove such notice without written permission of the Fire Officer.

K.  In case the owner or lien holder cannot be served within the time provided herein for service of such notice, the Corporation Counsel shall be advised of all facts in the case and shall take such action as he or she determines to be appropriate to effectuate adequate service of the notice as provided by law.

L.  In cases of emergency which, in the opinion of the Fire Officer, involve imminent danger to human life or health, the Fire Officer shall promptly cause such building, structure or portion thereof to be made safe or removed. For this purpose, the Fire Officer may at once enter such structure or land on which it stands, or abutting land or structure, with such assistance and at such cost as may be necessary. The Fire Officer may vacate adjacent structures and protect the public by appropriate barricades or such other means as may be necessary and, for this purpose, may close a public or private way.

(Kingston City Code §178-2, Dkt. No. 36-3, pp. 18-19).

### C.    Proceedings and Correspondence Involving the Property

According to Kerry L. Mitras, the Vice President of Plaintiff Vision for Children, Inc., the organization "sought to bring its ministry to New York State" in 2013. (Dkt. No. 46, ¶ 5). Vision for Children, Inc. is a not-for-profit corporation with the following mission statement: "In the name of Jesus, Vision for Children is helping meet the physical, emotional, spiritual and educational needs of children and young people, enabling them to change their world around them by breaking the cycle of darkness and poverty." (Dkt. No. 38, ¶ 1). Mitras states that Plaintiff learned about the property at 72 Garden Street in March 2013, and that there were building code violations against the property, open unpaid taxes in the amount of $34,000, and a

$100,000 line of credit against the property held by M&T Bank.  (Dkt. No. 46, ¶¶ 6, 11).  Marcy Perlmutter informed Mitras that her family could not afford to remedy and/or pay off these items. (*Id.*, ¶ 11).  Interested in acquiring the property, which was unique as a five-unit apartment building in a residentially zoned neighborhood, Mitras met with Defendant Allen, the Deputy Fire Chief of the City Fire Department, sometime between March and May 2013 to ascertain the extent of the building code violations.  (*Id.*, ¶¶ 8, 12).  According to Mitras, Allen stated that "the primary building code violation concerned the overhang of the building and its gutter support which was causing debris to fall upon the driveway of a neighboring property owned by Defendant Joseph Happeny."  (*Id.*, ¶ 13).

Mitras states that "[b]ecause my visit to 72 Garden had not disclosed any violations that could not be remedied I thereafter asked the Perlmutters if they would be willing to transfer the property to Vision for no cost if M&T removed the lien (the outstanding unpaid line of credit) and paid the back taxes, both as charitable gifts to Vision."  (*Id.*, ¶ 15).  According to Mitras, the Perlmutters agreed to this proposal, and "Vision authorized me to approach M&T to see what could be done concerning the equity line of credit and open taxes."  (*Id.*, ¶ 16).

On May 29, 2013, an attorney for Defendant Happeny, the owner of property adjacent to 72 Garden Street, sent a letter to the Building Safety Division, stating in relevant part: "the building at 72 Garden Street is literally crumbling, with soffits and chimneys collapsing, and slate tiles from the roof and other debris sliding off. The debris is landing on my client's property causing damage thereto, and putting him at risk of serious injury to person and property." (Dkt. No. 36-3, p. 11).  On June 26, 2013, the Building Safety Division sent a Violation Notice and Order to Remedy to the property owner.  (Dkt. No. 36-1, ¶ 7).  The Notice stated that the building "is in a state of disrepair," and "must be secured and stabilized, including all roofing,

6

soffits, facia, etc, so that it does not present a hazard." (Dkt. No. 36-3, p. 13). The Notice further stated that the property was in violation of Ordinance Code 304.1, which states that "[t]he exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health." (*Id.*). The property was also in violation of Ordinance Code 304.2, which relates to protective treatment for exterior surfaces, Ordinance 304.10, which relates to stairways, decks, porches, and balconies, and Ordinance 304.7, which relates to roofs and drainage. (*Id.*, pp. 13-14). The property owner was ordered to either eliminate the violations or file plans for corrective action by July 10, 2013. (*Id.*, p. 14).

According to Mitras, he learned in late January 2014 that the Perlmutters had received a notice of building code violations from the City. (Dkt. No. 46, ¶ 17). Mitras states that he arranged to meet again with Allen, as well as Happeny, the next door neighbor, "to address the violation(s)." (*Id.*). Mitras further states that when he explained Plaintiff's plan to turn the property into a home for orphan children, Happeny said that he did not want a "group home" next door to his property. (*Id.*, ¶ 18). According to Mitras, Allen reiterated his concern about the roof, gutter, and falling debris, and Allen indicated that "since Vision did not yet own the building only the Perlmutters could apply for the permit" to remedy the building code violations. (*Id.*, ¶ 19).

On February 13, 2014, Happeny sent an email to Defendants Carey and Noble, both City Aldermen, which stated the following:

> I'm Joe Happeny, one of your constituents. I reside at 70 Garden Street. I met you on my porch when you were running for office, and when you asked if I had any concerns about the neighborhood I remember pointing to the house next door, a red brick monstrosity that has been crumbling onto my driveway for years. The house and the entire situation have since further deteriorated, and now there is a new wrinkle which has further upset the neighborhood. Apparently the owner of record, Marcy Perlmutter, has been negotiating with a church group for a year and a half to donate the property for the construction of a home for at-risk teens. If

approved by the city, this is a plan that will:

1.) remove yet another property from the tax rolls, which means the rest of us will have to pay proportionately more for police, fire, water and trash removal services because the tax exempt owners will not have to make any contribution;
2.) require a variance from the current R2 to an R6 and thus continue the patchwork zoning that has plagued Kingston, especially mid-town, for so long, to the detriment of once healthy neighborhoods;
3.) lower neighborhood property values even more than the existing condemned building has since the prospect of living near what will be in essence a teen group home cannot be attractive to prospective buyers;
4.) reward another slum lord who will have gotten away with abandoning a building while ignoring two-going-on-three years of back tax obligations to both city and school district;
5.) choke an already crowded street with more traffic and use up scarce neighborhood street parking spaces.

If any or all of this is news to you, I hope you are as outraged as my neighbors are at the prospect of a plan that benefits so few at the expense of the rest of us. I look forward to discussing the matter with you at your earliest convenience.

(Dkt. No. 38, ¶ 10). On February 14, 2014, Happeny sent an almost identical email to Defendant Brown, another City Alderman. (*Id.*, ¶¶ 5, 11). Brown forwarded the email to several individuals, including Defendants Gallo and Zweben, stating "What is this? I was under the impression that we were in process of trying to get building demolished. . . . Does this project have a leg to stand on??" (Dkt. No. 36-3, p. 33). Gallo was the City Mayor at the time, and Zweben was Corporation Counsel. (Dkt. No. 38, ¶¶ 2, 4). On February 14, 2014, Brown replied to Happeny stating:

This is disturbing. I have contacted the planning board, the Mayor and corporation counsel via email on this matter. I am the city council liaison to the zoning board of appeals. I will be checking into this matter as soon as City Hall opens on Tues. Closed Monday for the holiday (president's day). I will definitely stay on top of this issue. Thank you for informing me of this turn of events.

(Dkt. No. 38, ¶ 12). On February 18, 2014, Happeny sent another email to Carey, which referred to a "lengthy call" with Mayor Gallo "assuring me of his support for the neighborhood regarding

the 72 Garden Street issue." (*Id.*, ¶ 13). On February 18, 2014, Defendant Ashdown, the City's

Inspector of the Building Department, sent Happeny the following email message:

> I am contacting you to keep you abreast of the current status of the above address
> and how our office will be enforcing the code violations moving forward. Upon
> my initial inspection on 1/27/14 it was found the roof, soffits and facias of the
> building were in need of repair due to severe deterioration and neglect. I mailed
> out an Order to Remedy the violations with a two week re-inspection date. I also
> spoke with Mrs. Perlmutter along with the bank informing them by phone what
> our concerns were as a dept. An inspection date was then set to inspect the entire
> property, interiorly and exteriorly, meeting with a representative of the bank along
> with a subcontractor for the bank to determine the severity of the deterioration
> interiorly. Legally we inspectors are not allowed to trespass onto property
> uninvited by the owner, we must conduct our inspections from the street. In this
> case, we were invited in by the bank and Mrs. Perlmutter. Upon the inspection on
> 2/10/14 it was found the interior of the building is so deteriorated our office is
> recommending demolition to the property. The bank's subcontractor present
> during the inspection concurs. A revised order to remedy has been mailed out as
> a result of the interior inspection ordering repairs or demolition to the building. If
> we do not receive word from the bank or Mrs. Perlmutter this week with a
> definitive plan of remedial action by way of building or demolition permits, our
> office will move forward with court action. Please be advised that our office is
> working very closely with Mayor Gallo on this issue and we will enforce these
> code violations aggressively moving forward.

(Dkt. No. 38, ¶¶ 6, 14). On February 19, 2014, Happeny sent an email to Gallo, which stated in

relevant part:

> Thank you for your phone call yesterday and your pledged support of our
> neighborhood in the matter of 72 Garden Street. This building has been such
> a burden on the entire block for the twenty-five years I've owned my home and,
> according to the neighbors, for a long time before. When it was occupied by its
> owner and tenants it was the subject of almost weekly Fire Department,
> ambulance and police response to everything from safety violations to drug
> activity to domestic violence. Its former occupants have been gone for some five
> years now, yet it still manages to cast a pall over the entire area and negatively
> affect the market value of our homes.
>
> Then to discover, quite by accident, that the property would be the source of even
> more annoyance by becoming a half-way house for troubled teens as well as
> being completely removed from the tax rolls and that this had been in the works
> among owner, bank and church group for a year and a half is just too much! To
> hear you say "Enough!" as well gives us some hope that the end may be in sight.
> Troy Ashdown has pledged to stay on top of the situation, and by all accounts,

> including yours, he is a man of his word.  Bill Carey, Andi Turco-Levin, Jim
> Noble and Deb Brown have also been very responsive with assurances that they
> find these developments troubling.

(Dkt. No. 38, ¶¶ 4, 16).  On February 24, 2014, Ashdown sent an email to Happeny, copied to

Gallo and Allen, which stated:

> As promised, here is an update on the above address: A summons to Court for
> Mrs. Perlmutter is being mailed out today with a date of March 11th, 2014 for
> City Court as a result of non-compliance of any and all Code violations on the
> above property.  If you have any questions please feel free to contact our office.

(*Id.*, ¶ 17).  On February 28, 2014, Happeny sent another email to Brown about the property,

who responded as follows:

> [S]ince our conversation this afternoon I have talked with Corporation Counsel at
> City Hall.  He stated that even when building is torn down they (Vision of Hope)
> would have a very poor chance to none of getting the zoning code change to
> accommodate a "group home" and planning board would follow suit in not
> approving any plans for this type of "home".  Not to mention the funds they
> would need.  Currently I am the Zoning Board Liaison for the Common Council
> and I get all actions and requests copies for zoning variances.  If need be I would
> appear and express neighborhood concerns but I am hopeful and almost confident
> that the group home idea is dead.  The current problem is getting that eyesore
> demolished and the city is working towards that goal.

(*Id.*, ¶ 19).  On March 4, 2014, Happeny and other neighbors sent a petition to the City Council,

stating as follows:

> The building at 72 Garden Street has been a burden on the entire area for over
> thirty years.  When it was occupied by its owner and tenants it was the subject
> of almost weekly Fire Department, ambulance and police response to everything
> from safety violations to drug activity to domestic violence.  It has been
> condemned twice in the last eight years and abandoned for the last five, yet it still
> manages to cast a dark shadow over the entire area and substantially
> lower the market value of our homes as well.
>
> The house is literally crumbling onto adjoining properties, is a dangerous fire trap,
> a habitat for vermin, an open invitation to vandalism and completely overgrown
> with weeds and trees.
>
> Recently there has been talk of the owner donating the property for the site of a
> group residence for at-risk teens.  This is not the answer to the problem.  Such a

> plan would increase the tax burden on the rest of Kingston's taxpayers by
> removing yet another property from the tax rolls, choke an already crowded street
> with more traffic and use up scarce neighborhood street parking spaces.
>
> Therefore, we the undersigned residents of the Garden Street neighborhood
> petition for
>
> 1.) the complete demolition of all buildings at the 72 Garden Street location, and
> 2.) the continuance of the property as it is currently zoned.

(Dkt. No. 46-9, pp. 2-3).  According to Mitras, on March 20, 2014, he inspected 72 Garden

Street with a commercial contractor in anticipation of the building being donated to Plaintiff.

(Dkt. No. 38, ¶ 23).  That same day, the contractor wrote a letter to Allen, which stated in

relevant part:

> This morning I visited the referenced property with Mr. Kerry Mitras.  During my
> visit I was able to walk the building.  The building is in need of repointing of the
> masonry façade, a new roof and interior demolition of existing ceilings and walls.
> Plumbing and electrical upgrades are also required. The building structure showed
> no signs of failure including foundations, floor joists and load bearing walls.

(*Id.*, ¶ 24).

On April 7, 2014, the City commenced a civil proceeding against the Perlmutters to have

72 Garden Street demolished, pursuant to Chapter 178 of the City's Building Code.  (*Id.*, ¶ 25).

The notice of the Chapter 178 proceeding was mailed to Marcy Perlmutter on April 7, 2014.

(*Id.*, ¶ 26).  The notice letter stated in relevant part:

> As of this date no effort has been made to repair the aforementioned property.
> You are hereby notified that as an unsafe building this structure constitutes an
> unsafe and unsanitary condition with respect to the dilapidated roof and soffits
> and interior hazards.
>
> Please be advised that a hearing will be held on April 28, 2014 at 9:00am at the
> Building Safety Division offices located at 5 Garraghan Drive, Kingston NY
> 12401, whereupon you will be given the opportunity to present evidence to rebut
> the findings of the building department that the above premises constitutes an
> unsafe building as defined in Chapter 178.  Please be further advised that you are
> obligated to present a plan to remedy the unsafe building and obtain a permit for

said plans, or to submit a plan and obtain a permit for the removal of the unsafe
building on or before May 30th, 2014.

In the event of your failure to submit a plan to remedy or remove the unsafe
building, the City of Kingston will proceed to remove the unsafe building.

(Dkt. No. 36-3, p. 21).  The property owner received notice of the hearing.  (Dkt. No. 36-1, ¶ 10).

On April 10, 2014, Ashdown emailed Happeny, stating in relevant part:

An in office hearing date of April 28th has been scheduled for 72 Garden St
basically stating to the Perlmutters that in the event a plan of remediation or
demolition for the above location is not submitted to our office, the City will then
move forward with demolition of the building and charge it to the property taxes.
Also, trial is set for next month, so we are hitting the Perlmutters with a two prong
attack.  I'm sorry to hear about the soffits collapsing, we are doing everything in
our power to hold the owners accountable.

(Dkt. No. 38, ¶ 31).  On April 12, 2014, Carey sent an email to Happeny stating in relevant part:

I will contact Troy and/or the Mayor to see if there is a way to expedite this
process.  As far as I'm concerned, the building needs to come down and the
sooner the better.  Let me know what else I can do to help.

(*Id.*, ¶ 32).  On April 28, 2014, a hearing was held, at which the Perlmutters did not appear, and

that day, the Building Safety Division sent a letter to Marcy Perlmutter, stating in relevant part:

Please be advised that a hearing was conducted on 4/28/14 pursuant to
Section 178 of the Code of the City of Kingston regarding your building
located at 72 Garden St and you did not appear to answer the preliminary
finding of the Deputy Chief in charge of the Fire Department Safety
Division that the building is unsafe as that term is defined in the City
Code.  Pursuant to Section 178.2(H), a determination has now been made
that the building is unsafe as that term is used in the City Code.  Please be
further advised that you have the right to appeal this determination to the
Fire Chief of the City of Kingston.

This letter will serve as notice that the owner or any lien holder has thirty
days from the date of said hearing to submit acceptable plans to remedy
the unsafe condition and fifteen days after submission of the plans to
secure a building permit.  Thereafter, all work in accordance with the plan
must be completed within six months from the issuance of the permit.

Absent the submission and approval of a plan to remediate or demolish, or
a successful appeal, the City of Kingston will proceed to remove the

> unsafe building as provided in the City Code and the costs will be assessed
> to you on your tax bill.

(Dkt. No. 36-3, p. 23).  On April 28, 2014, Ashdown also emailed Happeny stating:

> An in-office hearing was held today at the Building Safety Dept. regarding 72
> Garden St. per the Unsafe Building Code of City of Kingston Section 178.  The
> Perlmutters now have 30 days to present our office with a plan of remediation or
> demolition.  In the event plans are not submitted to repair or remove the building
> within that time frame, the City can then move forward with demolishing the
> building and charging the property owners per the City Code.

(Dkt. No. 38, ¶ 34).  The City and the property owner ultimately agreed upon an extension to

June 2, 2014 to submit a plan for remediation and/or permit for demolition of the premises.

(Dkt. No. 36-1, ¶ 11).  On the same date, a hearing would be held on the matter in City Court.

(*See* Dkt. No. 36-3, pp. 25-27).

On May 19, 2014, the premises were inspected by John Stinemire, an independent

engineer hired by the City.  (Dkt. No. 36-1, ¶ 14).  Meanwhile, M&T decided to pay the back

taxes and forgive the outstanding line of credit against the property so that Plaintiff could acquire

it from the Perlmutters at no cost.  (Dkt. No. 38, ¶ 35).  On May 22, 2014, Plaintiff closed title

and became the owner, through donation, of the property at 72 Garden Street.  (Dkt. No. 38, ¶¶ 7,

36; *see also* Dkt. No. 46-10, pp. 3-6).  According to Mitras, title records for the property "did not

show that any written notice had been filed by the City in the Ulster County Clerk's Office that

the City had commenced a proceeding pursuant to Chapter 178 to demolish 72 Garden."  (Dkt.

No. 46, ¶ 32; *see also* Dkt. No. 41, ¶¶ 4-5).  In addition, Mitras states that "[t]he only proceeding

that Vision and I were aware of prior to closing on the property was a criminal proceeding that

the City had commenced against the Perlmutters in the Kingston City Court for failing to correct

the building code violation(s) against the property."  (Dkt. No. 46, ¶ 37).

According to Daniel Gartenstein, an attorney for the City, "[o]ur office became aware sometime in late May or early June 2014" that title to the property had been transferred to Plaintiff. (Dkt. No. 36-3, ¶ 13). Gartenstein states that "[d]espite this transfer, all parties, including Vision for Children, Inc., were informed that this transfer of title has no effect on the ongoing proceedings or the deadlines previously set by the Building Department for submissions of plans for remediation or demolition." (*Id.*). However, Mitras avers that "[n]either I nor Vision was ever informed by anyone that the City commenced a Chapter 178 proceeding to demolish 72 Garden prior to Vision closing on the property on May 22, 2014." (Dkt. No. 46, ¶ 36).

On June 2, 2014, Mitras submitted a building permit application on behalf of Plaintiff to the City's Building Department to remedy the problems with 72 Garden Street. (Dkt. No. 38, ¶¶ 39-40). The previous owners had not filed any such application. (Dkt. No. 36, ¶ 12). Mitras states that he went with Mr. Perlmutter to City Court on June 3, 2014 for a criminal proceeding, where Judge Lawrence Ball imposed a fine for the building code violations. (Dkt. No. 46, ¶ 42). On June 5, 2014, Mitras emailed Judge Ball, copying Zweben, Allen, and Happeny, to state the following:

> I'm writing you because I am concerned about the safety of our property at 72 Garden Street as well as the safety of our neighbor, Joe Happeny.
>
> The roof and eaves on the house are in need of immediate repair and the building department has instructed us that we cannot make any repairs without a building permit. I don't believe this is the case citing Kingston building code:
>
> 172.5, section B, 10(a) which states; No permit required for:
>
> (Repairs, provided that such repairs do not involve, (a) Removal or cutting away of a load-bearing wall, partition, or portion thereof, or of any structural beam or load bearing component.)
>
> There is a hole in the roof and the built in gutters are leaking which has caused

the eaves to deteriorate and fall on the neighbors property.  The remaining eaves will continue to fall if not addressed.

I filed a permit application with Deputy Chief Allen on June 2 and have not received a reply which concerns me as we are in the midst of our second major rain event this week.  I tried submitting a permit application on May 30 with the building department and was told I had to come back on June 2 and file directly with Deputy Chief Allen.

The previous owners, Marcy and Barry Perlmutter, were before your court Tuesday of this week and were fined for not complying with the order to remedy these very code violations.  We do not want to be put in this same situation of paying fines for a situation that your building department controls.

We feel that the city of Kingston has placed a huge liability on itself for the continuing damage to our building, as well as the continuing threat of damage to our neighbor by not responding to our application.

I write this letter out of grave concern and I pray that you will allow us to protect our property and the property of our neighbor before something catastrophic happens.

(Dkt. No. 46-11, p. 2).  On June 5, 2014, Zweben sent Mitras an email, which stated in relevant

part:

The application filed by you for a building permit was incomplete.  It did not include building plans signed by a licensed professional for a job of this magnitude.  In anticipation of the acquisition of this building you have had months to have plans drafted and failed to do so.  Your inadequate preparation is not an excuse for the building department to violate the law.  The liability for this situation is entirely on you and the Perlmutters.

(Dkt. No. 38, ¶ 43).  Mitras responded to Zweben's email, also on June 5, 2014, and copied

Allen and Happeny, stating in relevant part:

I was not informed by the building department that we needed plans from a licensed professional to do the roof and eave repairs which is the only permit I seek at this time.  I asked the building department several months ago what was needed and was told proper insurances and a building permit application which I provided.  I also contacted the planning department in March to see how many children we would be able to accommodate at this house of hope with no response.  Interior plans cannot happen until we know how many orphans we will be housing.  It seems that none of your agencies want to work with us and it has me at a loss.  I understand your frustration for the long process this building has

15

put your city through but that was the previous owner, not us. We are trying to step up and do the right thing for the city and it's residents. This project is for your orphans and their futures of becoming responsible citizens. I ask you to let us fix the roof which has been your desire for a long time. Our greatest concern is for the safety of Mr. Happeny.

(*Id.*, ¶ 44). Zweben replied that day to Mitras, stating in relevant part:

[A]s I understand you are a contractor I would have assumed, and Chief Allen would rightly have assumed, that you are familiar with the building code and the State Education Law requirement for stamped plans for structural construction of this magnitude. More significantly what is entirely missing from your rudimentary email addressing phases of construction are any safety measures to protect the neighboring properties.

The City does not give gratuitous legal advice. I suggest you retain an attorney to review our code with respect to any use you hope to make of the building. In the absence of knowledge of what your intentions were with respect to the work on the building it would have been impossible for anyone to tell you what you needed to obtain a building permit.

(Dkt. No. 38, ¶ 45). On June 12, 2014, Vision hired Red Hook Engineering, P.C., and specifically architect Timothy A. Lynch, to "prepare plans for the rehabilitation of the building at 72 Garden Street." (*Id*, ¶ 46; Dkt. No. 43, ¶ 5). According to Lynch, after touring the building on June 11, 2014, "it was my opinion that the building was in excellent structural condition despite the obvious damage to the roof and water damage to finishes on the interior and exterior." (Dkt. No. 43, ¶ 7). Lynch further states that "[t]he bearing walls were fully intact with little to no significant deterioration and the primary wood framing members appeared sound, although wet," and there was "no evidence observed of any significant deterioration to the primary structure. (*Id.*, ¶¶ 7-8). According to Lynch, "[t]he only apparent dangerous condition was that of the built-in gutter and overhanging trim along the South side of the gambrel roof adjacent to the driveway of 70 Garden Street (Defendant Happeny's premises)." (*Id.*, ¶ 8).

On June 15, 2014, the engineer retained by the City, Stinemire, submitted his report regarding 72 Garden Street. (Dkt. No. 36-3, pp. 29-31). Stinemire noted that: 1) "The south side

of the roof exhibits significant deterioration to the roofing, roof framing and soffit. A portion of the soffit has previously fallen from this area due to deterioration."; 2) "The roof structure over the rear roof deck lacks adequate lateral bracing and is unsafe. This roof framing could collapse under heavy winds and is a potential hazard."; 3) "The rear two-story porch exhibits significant deterioration at the first floor level. This porch does not have an adequate foundation."; and 4) "The roof system is not weather tight and water is ponding on the third floor level due to continued roof leakage. Significant deflection of this floor system is evident." (*Id.*, p. 29). Stinemire concluded that: "It is my professional opinion that this structure is unsafe and poses an imminent danger to the general public. This building should be demolished as soon as possible." (*Id.*). But Stinemire also testified that the deficiencies he identified with the building could be remedied and that he indicated as much to Zweben. (Dkt. No. 46-19, pp. 50-52).

The building at 72 Garden Street continued to deteriorate and large portions of debris continued to fall onto Happeny's property next door. (Dkt. No. 36-1, ¶ 13). On June 14, 2014, Happeny reported that "another large section of soffit and roofing material from 72 Garden St. crashed onto my driveway, no more than two minutes after I had been walking on that very part of my property." (Dkt. No. 36-3, p. 36). Happeny also stated that: "Aside from the daily collapse of smaller pieces of the condemned 72 building which has been ongoing for years, this is the second major section to give way in the last two months. At this time two ten-foot sections are still dangling from the roof. Above that are many courses of slate shingles held up, for the moment, by rusty nails, and two stone chimneys that have, at best, questionable support." (*Id.*). The next day, Happeny reported that "a dangling six-foot piece of sheet metal" had fallen. (*Id.*, p. 44).

According to Mitras, he met with Zweben and Allen on June 27, 2014 and learned "for the first time that the City had gone through a 'long process' to have 72 Garden demolished." (Dkt. No. 46, ¶ 50). Mitras states that Zweben indicated that "the City had already held a hearing and determined that the building was unsafe and that the time had passed for building plans to be submitted to correct the building code violations." (*Id.*). Mitras further states that he informed them of Plaintiff's intention to fix the property, and that Plaintiff had hired an engineering firm to develop remediation plans for 72 Garden Street. (*Id.*, ¶ 51). Mitras states that "Zweben and Allen asked me to have our engineer provide plans to repair the building and obtain Happeny's permission to go onto his property to fix the portion of 72 Garden from which debris was falling onto his property." (*Id.*).

That same day, June 27, 2014, Mitras emailed Happeny to obtain his permission "to put up staging and a protective barrier along our building on your driveway" to facilitate repair of the roof and overhangs on the building. (Dkt. No. 43-3, p. 2). On July 3, 2014, Mitras and Lynch again met with Zweben and Allen regarding preliminary plans for remediation of the building; Mitras and Lynch were told by Zweben that Plaintiff needed to either get permission from Happeny to do the repairs or develop a plan to do the work without using Happeny's property. (Dkt. No. 38, ¶¶ 54-55; Dkt. No. 43, ¶ 11). Lynch emailed Happeny's attorney on July 7, 2014 to inquire about accessing the property to do repairs. (Dkt. No. 43-4, p. 2). Neither Happeny nor his attorney ever gave Plaintiff permission to use a portion of Happeny's premises to complete the repairs to 72 Garden Street. (Dkt. No. 38, ¶ 57; Dkt. No. 46, ¶¶ 52, 56). On July 9, 2014, Lynch presented revised plans to the City's Building Department to do the repairs without using Happeny's property. (Dkt. No. 43-5).

On July 20, 2014, Happeny emailed all of the Defendants to report that "another section (about four feet long) of sheet metal and lumber fell into my driveway."  (Dkt. No. 36-3, p. 52). Happeny further stated: "This is the fourth collapse to date, and two more ten-foot sections remain hanging by a thread."  (*Id.*).  Brown forwarded the email to Zweben, writing: "I feel so bad for this man!!  This is most frustrating for all concerned.  Where are we in this process of demolition this major safety hazard.? (other than praying for lightening….)  I am afraid of a bystander getting struck inadvertently…not to mention Mr. Happeny."  (*Id.*).  On July 20, 2014, Zweben emailed another Kingston official, stating in relevant part:  "I spoke to David Allen about this on Thursday and told him to go ahead and hire the contractor. We cleared all the legal hurdles and the Mayor wants the building taken down to avoid damage to people and property." (Dkt. No. 36-8, p. 2).

On July 23, 2014, Allen sent a letter to Plaintiff which stated:

Please be advised that I have determined that the structure located at 72 Garden Street is an imminent danger to human life and must be removed immediately.

The plans submitted by the building owner to remedy the hazardous condition are incomplete in that, inter alia, there is no engineered design for a significant element of the plan as reviewed by professional engineer.  In addition, the consent of the adjoining neighbor for use of his property and air space has not been obtained.

Work should commence when authorized by N.Y. State Department of Labor.

If in the opinion of the City of Kingston Engineer it is necessary, in order to protect the public, that the structures adjacent to 72 Garden Street be vacated or that barricades or other means be utilized on Garden Street I am directing that same be done.

(Dkt. No. 36-3, p. 90).

On August 4, 2014, the premises at 72 Garden Street were demolished by a contractor retained by the City.  (Dkt. No. 36-1, ¶ 17).  According to Mitras, on August 19, 2014, he filed

an appeal "of Allen's determinations contained in his July 23, 2014 letter pursuant General City Law § 81-a(5)(b)," but was informed that the building had already been demolished. (Dkt. No. 46, ¶¶ 66-67). Lynch opines in his affidavit that "there was no justification for its demolition from either a rational engineering basis or an architectural perspective." (Dkt. No. 43, ¶ 20).

In February 2015, Plaintiff received its 2015 City and County Real Property Tax Bill from the City which included, as part of the total 2015 tax levy of $56,761.89, an item in the amount of $55,618.99 representing the City's cost for the demolition of the 72 Garden Street building. (Dkt. No. 38, ¶ 68).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 427 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a

reasonable juror to return a verdict in his or her favor on an essential element of a claim")
(internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts
showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at
323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary
judgment motion, the district court must construe the facts in the light most favorable to the non-
moving party and must resolve all ambiguities and draw all reasonable inferences against the
movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the
nonmoving party "must do more than simply show that there is some metaphysical doubt as to
the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),
and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome
a motion for summary judgment." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.
1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore,
"[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material
fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)
(quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and
citations omitted)).

## IV.    DISCUSSION

In the Second Amended Complaint, Plaintiff asserts the following constitutional claims
under 42 U.S.C. § 1983: 1) violation of the Fourteenth Amendment right to due process; 2)
violation of the First Amendment right to free exercise of religion; and 3) violation of the
Fourteenth Amendment right to Equal Protection. (Dkt. No. 24). Plaintiff also asserts statutory
claims for: 4) violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; and 5) violation of the

Religious Land Use & Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.* (*Id.*).  Plaintiff also brings claims under New York state law for negligence, trespass, and wrongful demolition.  (*Id.*).  The City Defendants seek summary judgment on all claims against them, while Plaintiff seeks partial summary judgment on its RLUIPA claim against Defendant City.  (Dkt. Nos. 36, 37).

> ### A.     Individual Defendants

As an initial matter, Defendants argue that there is no evidence of personal involvement of the Defendants Gallo, Noble, Carey, Brown, or Ashdown in the claims alleged by Plaintiff, and that "the only named defendants involved with the proceeding which eventually led to the demolition of plaintiff's premises were Deputy Fire Chief David Allen and former Corporation Counsel Andrew Zweben, who was involved in a supervisory capacity supervising the actions of the Corporation Counsel's office in litigating the enforcement proceedings."  (Dkt. No. 36-9, p. 19).  Plaintiff agrees as to defendant James Noble and "asks that the claims against him be deemed withdrawn."  (Dkt. No. 40, p. 25).  However, Plaintiff contends that the record "supports Vision's claims against Shayne Gallo, Deborah Brown, William Carey and Troy Ashdown that they, in concert with Happeny (and Zweben and Allen), sought to prevent Vision's ministry from coming to 72 Garden Street."  (*Id.*).  As evidence, Plaintiff points to the fact that "all of these defendants communicated with Happeny, either by email or by phone, expressing their support and efforts to have Vision's building demolished so that Vision could not practice its ministry at that location."  (*Id.*).

Personal involvement of an individual defendant "in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  Moreover,

22

"a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). "Because vicarious liability is inapplicable to . . . § 1983 suits," Plaintiff must raise a genuine dispute as to whether "each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) (emphasis added). "Personal involvement may be shown by 'direct participation,' which requires in this context 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Id.* at 67 (quoting *Provost*, 262 F.3d at 155). Setting aside Defendants Allen, Zweben, and Noble, the question is then whether there is sufficient evidence to show personal involvement by Defendants Gallo, Carey, Brown, and Ashdown.

The record shows that Defendant Allen made the official decision to declare an emergency situation and order the demolition of Plaintiff's property and that Defendant Zweben was also extensively involved in the decision. (*See* Dkt. No. 36-3, p. 90; Dkt. No. 36-8, p. 2). As to Mayor Gallo, there is some evidence that he directed the decision. On July 20, 2014, three days before Allen declared an emergency, Zweben wrote in an email that he spoke with Allen "and told him to go ahead and hire the contractor. We cleared all the legal hurdles and the Mayor wants the building taken down to avoid damage to people and property." (Dkt. No. 36-8, p. 2). Thus, there is an issue of fact as to whether Mayor Gallo directly participated in the alleged constitutional violations.

Although there is some evidence that Defendants Carey, Brown, and Ashdown communicated their support for the decision to demolish the property, Plaintiff has failed to

adduce evidence that they participated in any direct way. Alderman Carey received related emails and told Happeny that as far as he was concerned, "the building needs to come down," (Dkt. No. 38, ¶ 32), but there is no evidence that he directed the decision or played any significant part in the process. While Alderman Brown called the building an "eyesore" and assured Happeny that the City was working on getting it demolished, (*id.*, ¶ 19), again, there is no evidence of her direct participation. As the City's Building Inspector, Ashdown was involved in the civil proceeding against the previous property owner, (*see id.*, ¶¶ 6, 14), but there is no evidence of his direct participation in the demolition decision.

In sum, Plaintiff has failed to adduce evidence that Defendants Carey, Brown, and Ashdown directly participated in the decision to declare an emergency and demolish Plaintiff's property, which is the core of the relevant claims.[2] At most, the record shows that these officials were peripherally involved in the process leading up to demolition and supported the decision. Without more, no reasonable jury could find that these officials were personally involved in the alleged constitutional violations, and thus, Plaintiff's claims against them must be dismissed. *See Canner v. City of Long Beach*, No. 12 Civ. 2611, 2015 WL 4926014, at *4, 2015 U.S. Dist. LEXIS 108980, at *9 (E.D.N.Y. Aug. 18, 2015) ("While the emails demonstrate negative feelings towards Radin and McCormack, plaintiffs still fail to allege that the City Council defendants and Schnirman were at all involved in the actual adverse actions about which plaintiffs complain."); *Stancuna v. Town of Wallingford*, 487 F. Supp. 2d 15, 22 (D. Conn. 2007)

---

[2] Moreover, Plaintiff has failed to adduce evidence showing the personal involvement of these Defendants under any of the other methods recognized by the Second Circuit. *See Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (explaining that a plaintiff may establish personal involvement by making any one of five showings, citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)), *cert. denied sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016). The Second Circuit has not expressly addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing personal involvement, *see Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013), but nevertheless, in this case, Plaintiff has failed to show the personal involvement of Carey, Brown, and Ashdown even under the *Colon* standards.

("Here, there is simply no evidence in the record that Dickinson initiated, made, or otherwise caused the Planning and Zoning Department to engage in zoning enforcement activity against plaintiff in February 2005 as plaintiff claims. . . . Plaintiff's speculation that the Mayor somehow had a hand in the enforcement actions taken does not demonstrate a triable claim and does not suffice to defeat summary judgment in favor of Dickinson.").

### B.    Due Process Claims

The Due Process Clause of the Fourteenth Amendment contains both a procedural component and a substantive component. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Id.* (internal quotation and citation omitted). The procedural component, on the other hand, applies where there is an alleged deprivation by government action of a constitutionally protected interest without sufficient procedural safeguards, such as notice and a hearing.  *Id.*[3]

### 1.    Procedural Due Process

"The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, 'only against deprivations without due process of law.'" *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (quoting *Parratt v. Taylor*, 451 U.S. 527, 537 (1981) (internal quotation marks omitted), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). Review of a procedural due process question involves a "two-step inquiry;" the Court "must determine (1) whether [the plaintiff] possessed a liberty or property interest and, if so, (2) what

---

[3] The parties assume that Plaintiff has alleged a substantive as well as a procedural due process claim, and the Court will do likewise.

process he was due before he could be deprived of that interest." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002).

First, there is no dispute that Plaintiff had a property interest in 72 Garden Street as the owner of the real property. But Defendants argue that Plaintiff was afforded adequate process before deprivation of the property. (Dkt. No. 36-9, p. 7). Essentially, Defendants contend that since the previous owner of the property received notice and a hearing before demolition of the property, Plaintiff transitively received all the process that was due. (*Id.*, pp. 8-9). But Plaintiff argues that the pre-deprivation process afforded to the previous owner is irrelevant to Plaintiff's own rights. (Dkt. No. 40, p. 6). Plaintiff points out that "at no time prior to the demolition of the building on 72 Garden Street was a § 178-2(C) Notice ever filed with the Ulster County Clerk by the City's Fire Officer (in this case Defendant Allen) or anyone else." (*Id.*, p. 7). Thus, Plaintiff argues, it was "never placed on notice of the Chapter 178 proceeding against the Perlmutters as required by § 178-2(E) and, under New York law, was not bound by any judgment, finding or determination made in that proceeding." (*Id.*). In response, Defendants argue that Plaintiff had constructive notice of the Chapter 178 proceeding. (Dkt. No. 47-1, p. 9).

The Court need not resolve whether Plaintiff received adequate pre-deprivation process, however, because it is undisputed that in demolishing the property, the City ultimately invoked the "emergency" provision of the Code, which states that "[i]n cases of emergency which, in the opinion of the Fire Officer, involve imminent danger to human life or health, the Fire Officer shall promptly cause such building, structure or portion thereof to be made safe or removed." *See* § 178-2(L). It is well-settled that "although notice and a predeprivation hearing are generally required, in certain circumstances, the lack of such predeprivation process will not offend the constitutional guarantee of due process, provided there is sufficient postdeprivation process."

*Catanzaro v. Weiden*, 188 F.3d 56, 61 (2d Cir. 1999) (citing *Parratt*, 451 U.S. at 538). "[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Id.* (quoting *Parrott*, 451 U.S. at 539).

Therefore, in emergencies, due process is violated "only when an emergency procedure is invoked in an abusive and arbitrary manner," assuming post-deprivation processes are adequate. *Reynolds v. Krebs*, 336 F. App'x 27, 29 (2d Cir. 2009) (citing *Catanzaro*, 188 F.3d at 62). The necessary inquiry is twofold: "whether there was an emergency that required immediate action, and whether adequate post-deprivation remedies were available." *Canzoneri v. Inc. Village of Rockville Ctr.*, 986 F. Supp. 2d 194, 203 (E.D.N.Y. 2013).

### a.    Emergency Situation

Here, Defendants argue that the City had sufficient evidence to support its determination to proceed with the demolition of Plaintiff's property "based upon the emergency situation posed by the deteriorating condition of the premises at 72 Garden Street." (Dkt. No. 36-9, pp. 15-16). Plaintiff contends that there was no genuine emergency that required demolition of the building, and that "repairs could have been made without demolishing the building and that Vision repeatedly made it clear to the City that it was ready, willing and able to do make those repairs as soon as the City granted Vision's application for a building permit." (Dkt. No. 40, p. 10).

"[W]here there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion."

*Catanzaro*, 188 F.3d at 63.  The reason for this "somewhat deferential standard" is that officials

must be able to take "prompt action to insure the public safety."  *Id.*  But ultimately, "[w]hether

the official abused his discretion or acted arbitrarily in concluding that a genuine emergency

exists is a factual issue, subject to the usual considerations for a district court addressing a

summary judgment motion."  *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 51 (2d Cir.

2009).

    In this case, Deputy Fire Chief Allen declared an emergency under the City Code on July

23, 2014, when he notified Plaintiff that the structure presented "an imminent danger to human

life and must be removed immediately."  (Dkt. No. 36-3, p. 90).  Allen's letter further stated that

"[t]he plans submitted by the building owner to remedy the hazardous condition are incomplete

in that, inter alia, there is no engineered design for a significant element of the plan as reviewed

by professional engineer," and that "the consent of the adjoining neighbor for use of his property

and air space has not been obtained."  (*Id.*).  Allen did not specify what the hazardous condition

was or how the building posed an imminent danger to human life.  Moreover, it is unclear

whether there was competent evidence underlying the decision to allow Allen to reasonably

believe an emergency existed.

    On the one hand, the decision is supported by the June 15, 2014 report by the engineer

Stinemire, who concluded that "this structure is unsafe and poses an imminent danger to the

general public" and "should be demolished as soon as possible."  (Dkt. No. 36-3, p. 29).

Stinemire noted problems including deterioration to the roofing, roof framing and soffit, and rear

porch, and identified the roof structure over the rear roof deck as a potential hazard which "could

collapse under heavy winds" due to inadequate lateral bracing.  (*Id.*).  In a February 18, 2014

email, Building Inspector Ashdown noted that "the interior of the building is so deteriorated our

office is recommending demolition." (Dkt. No. 38, ¶ 14). Happeny had also reported increasing

deterioration of the building in the summer of 2014, with large pieces falling onto his property.

(Dkt. No. 36-3, pp. 36, 52).

On the other hand, Plaintiff's architect, Lynch, toured the building on June 11, 2014 and

concluded that it was in "excellent structural condition," with "no evidence observed of any

significant deterioration to the primary structure." (Dkt. No. 43, ¶¶ 7-8). According to Lynch,

"[t]he only apparent dangerous condition was that of the built-in gutter and overhanging trim

along the South side of the gambrel roof adjacent to" Happeny's property. (*Id.*, ¶ 8). On March

20, 2014, Plaintiff's contractor wrote a letter to Allen that stated "[t]he building structure showed

no signs of failure including foundations, floor joists and load bearing walls." (Dkt. No. 38, ¶

24). Nowhere in Stinemire's report did he identify any structural problems with the building

which necessitated demolition. Indeed, he testified that the deficiencies with the building could

be remedied and that he indicated as much to Zweben. (Dkt. No. 46-19, pp. 50-52).

Moreover, there is evidence that the danger posed by the building – pieces of the

structure falling onto neighboring properties – was a long-standing problem. On May 29, 2013,

Happeny's attorney warned the Building Safety Division that the building "is literally crumbling,

with soffits and chimneys collapsing, and slate tiles from the roof and other debris sliding off.

The debris is landing on my client's property causing damage thereto, and putting him at risk of

serious injury to person and property." (Dkt. No. 36-3, p. 11). In a February 14, 2014 email to

City officials, Happeny wrote that "[t]his monstrosity has been abandoned, condemned and

crumbling onto my driveway for years." (Dkt. No. 38, ¶ 10). Further, there is evidence that

Plaintiff offered to promptly fix the property in the summer of 2014, but neither Happeny nor the

City Defendants were receptive. (Dkt. No. 38, ¶¶ 46, 57; Dkt. No. 43, ¶ 5; Dkt. No. 43-3, p. 2;

Dkt. No. 43-5; Dkt. No. 46, ¶¶ 52, 56).  It is also noteworthy that the City waited approximately

50 days to demolish the building after Stinemire recommended doing so.  (Dkt. No. 36-3, p. 29).

All of this evidence calls into question the urgency of the situation.

Finally, there is evidence that Defendants sought to demolish the property long before

invoking the City's emergency procedure, for reasons unrelated to public safety.  For example,

starting in February 2014, Happeny complained to City officials that a "church group" was

planning to turn the property into a "home for at-risk teens."  (Dkt. No. 38, ¶¶ 4-5, 10-11, 16).

On February 28, 2014, Brown emailed Happeny and stated that "I am hopeful and almost

confident that the group home idea is dead," and that "[t]he current problem is getting *that*

*eyesore* demolished and the city is working towards that goal."  (*Id.*, ¶ 19) (emphasis added).

Then on April 7, 2014, the City commenced a proceeding to have the property demolished, (Dkt.

No. 36-3, p. 21), before the City's engineer Stinemire even visited the property on May 19, 2014.

(Dkt. No. 36-1, ¶ 14).  On May 22, 2014, Plaintiff became owner of the property, asserted its

intention to fix the problems, and made several efforts to get started, before the decision was

made to demolish the property on July 23, 2014.  (*See* Dkt. No. 38, ¶¶ 7, 36, 39-40, 44, 54, 62).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could infer that

Allen only deemed the situation an emergency in order to make sure the building came down.

In an analogous case involving the "emergency" demolition of a movie theater marquee,

the court denied summary judgment on a procedural due process claim.[4]  *See Cinema Art*

*Theater, Inc. v. City of Troy*, 810 F. Supp. 2d 489 (N.D.N.Y. 2011).  Defendants argued that "a

predeprivation hearing was not required because the condition of the marquee presented a

---

[4] In contrast, the instant case is distinguishable from *Catanzaro*, where the Second Circuit upheld the district court's grant of summary judgment on the defendants' procedural due process claim related to an "emergency" demolition, based on undisputed evidence that the plaintiff's building was "severely damaged" by an automobile accident and the defendants ordered and carried out the demolition of the building immediately after the accident.  188 F.3d at 63. Moreover, in that case the plaintiff claimed that he could not afford to repair the building.  *Id.* at 59.

genuine emergency that required urgent action and an adequate postdeprivation remedy was available." *Id.* at 496. However, the court found "conflicting evidence relating to the condition of the marquee, the apparentness of that condition, and the seemingly limited nature and extent of the City's inspection—all of which arguably call into question the competency of the evidence underlying the defendants' decision to remove the marquee and the reasonableness of the decision based on that evidence." *Id.* at 497. Thus, the court could not conclude as a matter of law "that defendants did not abuse their discretion in concluding that the marquee created a genuine emergency." *Id.*

Much the same, in this case, although the decision to invoke the City's emergency procedure is due some deference, there is conflicting evidence as to the severity and urgency of the situation and the motivation of the decision-makers, all of which calls into question the competency of the evidence underlying the decision. Therefore, Defendants are not entitled to summary judgment since "there is a genuine issue of fact as to whether officials acted arbitrarily in declaring an emergency."[5] *WWBITV, Inc.*, 589 F.3d at 51; *see also Burtnieks v. City of New York*, 716 F.2d 982, 988 (2d Cir. 1983) ("Thus, the existence *vel non* of an emergency herein is a material fact and is vigorously contested by the parties. Consequently, we conclude that summary judgment was improperly granted to the appellees."); *DeBari v. Town of Middleton*, 9 F. Supp. 2d 156, 162 (N.D.N.Y. 1998) ("because there exists an issue of material fact whether emergency circumstances required the immediate demolition of the DeBari Building, plaintiffs' procedural due process claim must stand").

---

[5] The parties also dispute whether Plaintiff was afforded an adequate post-deprivation remedy, the second prong of the procedural due process inquiry. (*See* Dkt. No. 36-9, p.10; Dkt. No 40, p. 17; Dkt. No. 47-1, p. 18). However, the Court need not reach this question, since there is an issue of fact as to whether there was an emergency situation. *See Reynolds*, 336 F. App'x at 29 (even assuming postdeprivation processes are adequate, due process is violated "when an emergency procedure is invoked in an abusive and arbitrary manner") (citing *Catanzaro*, 188 F.3d at 62).

2.    **Substantive Due Process**

The threshold question in considering an alleged violation of substantive due process "'is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Graziano v. Pataki*, 689 F.3d 110, 119 (2d Cir. 2012) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  For such a claim to survive summary judgment, a plaintiff must show that "the defendants infringed [on its] property interest in an arbitrary or irrational manner." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001); *see also Catanzaro*, 188 F.3d at 64 ("To succeed on their substantive due process claim, [the plaintiff] must show that the government action was arbitrary, conscience-shocking, or oppressive in a constitutional sense, and not merely incorrect or ill-advised.") (internal quotation marks and citation omitted).

Defendants argue that Plaintiff's substantive due process claim "is equally without merit for the very same reasons that the City's determination to proceed with the demolition of the structure was not arbitrary and was otherwise a proper exercise of a municipal employee's discretion." (Dkt. No. 47-1, p. 20).  Plaintiff contends that "the facts and circumstances leading up to the building's demolition compel the inference that the defendants were intent on making sure that 72 Garden Street would not become a religious orphanage." (Dkt. No. 40, p. 20).  Viewing the evidence in the light most favorable to Plaintiff, i.e. assuming that Defendants arbitrarily declared an emergency for the purpose of demolishing Plaintiff's property before a new hearing could be held or repairs could be done, there is a material issue of fact as to whether Defendants' conduct rises to the level of shocking the conscience.  Therefore, Defendants are not entitled to summary judgment on Plaintiff's substantive due process claim.  *See Roberts v. Phillips*, No. 06 Civ. 2866, 2009 WL 3241525, at *3, 2009 U.S. Dist. LEXIS 97281, at *11

(S.D.N.Y. Sept. 30, 2009) (denying summary judgment on Fourteenth Amendment claim where "a question of fact is raised as to whether Defendant's behavior as described by Plaintiff 'shocks the conscience'"); *Hirsch v. Otsego County Dept. of Soc. Services*, No. 89 Civ. 954, 1992 WL 59178, at *5, 1992 U.S. Dist. LEXIS 3052, at *12-13 (N.D.N.Y. Mar. 12, 1992) ("[B]ased upon the facts as presented by plaintiff, a reasonable jury could conclude that [the defendant's]conduct was so egregious that it shocked the conscience. In other words, plaintiff has shown that there exists a genuine issue of material fact as to whether [the defendant] violated plaintiff's rights as secured by the due process clause.").

## C.    Qualified Immunity

In addition, Defendants argue that "the decision by the municipal officer of the City of Kingston resulting in demolition of Plaintiff's premises was a discretionary act entitling the City Defendants to full immunity from liability." (Dkt. No. 36-9, p. 17). In response, Plaintiff argues that since "Allen's decision was 'to demolish without giving notice and an opportunity to be heard' it 'cannot be classified as a discretionary decision' and Allen is therefore not entitled to the asserted governmental immunity." (Dkt. No. 40, p. 23). Rather, Plaintiff contends that "the evidence compels the finding that Allen arbitrarily and pretextually invoked the emergency provisions of the Unsafe Building Code." (*Id.*, p. 24).

In general, "[q]ualified immunity protects public officials performing discretionary functions from personal liability in a civil suit for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the

objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (internal quotations and citations omitted). Thus, whether an official's conduct was objectively reasonable is a mixed question of law and fact.

As discussed above, issues of fact remain in this case as to the condition of Plaintiff's property and whether it posed an emergency. Viewing the evidence in the light most favorable to Plaintiff, assuming that Defendants arbitrarily and unnecessarily declared an emergency for the purpose of demolishing Plaintiff's property without regard for Plaintiff's due process rights, the Court cannot conclude that Defendants' actions were objectively reasonable. Accordingly, Defendants are not entitled to qualified immunity at this juncture. *See Cinema Art Theater, Inc.*, 810 F. Supp. 2d at 500 ("In this case, the court has already determined that the failure to afford the Theater a predeprivation hearing may have amounted to a procedural due process violation. Thus, because questions of fact exist in that respect, and given Reeves and Garrett's involvement in the inspection and decision to remove the marquee, the court is not currently persuaded that Reeves and Garrett are necessarily entitled to qualified immunity.").

**D.    RLUIPA Claim**

Plaintiff argues that it is entitled to summary judgment on its RLUIPA claim against the Defendant City. (Dkt. No. 40, p. 25). The RLUIPA provides that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  The term "land use regulation" means "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest."  § 2000cc-5(5).  "The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."  § 2000cc-5(7)(B).  As relevant here, the RLUIPA applies in any case in which "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved."  § 2000cc(a)(2)(C). "Under RLUIPA, once a religious institution has demonstrated that its religious exercise has been substantially burdened, the burden of proof shifts to the municipality to prove it acted in furtherance of a compelling governmental interest and that its action is the least restrictive means of furthering that interest."  *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) (citing § 2000cc–2(b)).

### 1.    Substantial Burden

Plaintiff argues that "the City's decision to deny Vision's building permit application (and to demolish the building) 'substantially burdened' Vision's exercise of religion by preventing Vision from using 72 Garden Street as a religious orphanage and that such decision constituted an 'application' of the City's zoning law."  (Dkt. No. 40, p. 27).  The claim concerns Plaintiff's building permit application, and not the demolition itself, because only the former

involves the application of zoning or landmarking law, i.e. a "land use regulation."[6]  However,

Defendants contend that Plaintiff was never even denied a building permit, but rather, "simply

advised that their building permit application was incomplete as it failed to address certain

specific [sic] as required in the City's building code statute and further failed to address certain

safety concerns."  (Dkt. No. 47-1, p. 25).

In general, "a substantial burden on religious exercise exists when an individual is

required to 'choose between following the precepts of her religion and forfeiting benefits, on the

one hand, and abandoning one of the precepts of her religion . . . on the other hand.'"

*Westchester Day Sch.*, 504 F.3d at 348 (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).

"But in the context of land use, a religious institution is not ordinarily faced with the same

dilemma of choosing between religious precepts and government benefits."  *Id.* at 348-49.

"Accordingly, when there has been a denial of a religious institution's building application,

courts appropriately speak of government action that directly *coerces* the religious institution to

change its behavior, rather than government action that forces the religious entity to choose

between religious precepts and government benefits."  *Id.* at 349.  In *Westchester Day School*,

the Second Circuit explained several factors which indicate whether a zoning decision imposes a

substantial burden on a religious institution.  For example, an adverse decision that is final or

absolute is more likely to impose a substantial burden than a conditional denial.  *Id.*  But even a

"conditional denial may represent a substantial burden if the condition itself is a burden on free

exercise, the required modifications are economically unfeasible, or where a zoning board's

stated willingness to consider a modified plan is disingenuous."  *Id.*  And further, "where the

---

[6] Under the City Code, demolition of unsafe buildings is a matter of public safety, unrelated to zoning of property. (*See* Kingston City Code §178, Dkt. No. 36-3, pp. 18-19); *see also St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 640 (7th Cir. 2007) ("we reject the argument that the City's plan to condemn the St. Johannes Cemetery under the OMA is an act of zoning"); *Faith Temple Church v. Town of Brighton*, 405 F. Supp. 2d 250, 254 (W.D.N.Y. 2005) (finding that town's eminent domain proceedings were not a land use regulation).

denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, even when the denial is definitive." *Id.* A finding of "substantial burden" is less likely when the plaintiff has other alternatives available to it, such as where it can readily build elsewhere. *Id.* Generally applicable burdens, resulting from the "neutral application of legitimate land use restrictions" are not substantial. *Id.* at 350. However, a substantial burden may exist "where land use restrictions are imposed on the religious institution arbitrarily, capriciously, or unlawfully," since "[t]he arbitrary application of laws to religious organizations may reflect bias or discrimination against religion." *Id.*

In this case, the record shows that on June 2, 2014, Mitras submitted Plaintiff's application for a building permit to the City to fix the problems with 72 Garden Street. (Dkt. No. 38, ¶¶ 39-40). On June 5, 2014, Zweben sent Mitras an email which stated that application was incomplete. (*Id.*, ¶ 43). According to Mitras, he met with Zweben and Allen on June 27, 2014 , informed them of Plaintiff's intention to fix the property, and "Zweben and Allen asked me to have our engineer provide plans to repair the building and obtain Happeny's permission to go onto his property to fix the portion of 72 Garden from which debris was falling onto his property." (Dkt. No. 46, ¶ 50). After unsuccessful attempts to obtain Happeny's permission, Lynch presented revised plans to the City's Building Department on July 9, 2014 to do the repairs without using Happeny's property. (Dkt. No. 43-5). There is no evidence of further action on Plaintiff's application, and then Allen declared an emergency on July 23, 2014 and the building was demolished on August 4, 2014. (Dkt. No. 36-1, ¶¶ 16-17).

At a minimum, there are several issues of fact as to the alleged substantial burden on Plaintiff's exercise of religion: 1) whether the City denied Plaintiff's application completely or conditionally, particularly given the pending demolition; 2) whether Plaintiff had other

alternatives available to it besides the property at 72 Garden Street; and 3) whether the City acted

neutrally or arbitrarily, as discussed above in Part IV(B)(1).  Accordingly, Plaintiff is not entitled

to summary judgment on its RLUIPA claim.[7]  *See Bikur Cholim, Inc. v. Village of Suffern*, 664

F. Supp. 2d 267, 291 (S.D.N.Y. 2009) (denying summary judgment on RLUIPA claim, where,

inter alia, "there is a question of fact as to whether private plaintiffs' religious exercise was

substantially burdened"); *Westchester Day Sch. v. Village of Mamaroneck*, 379 F. Supp. 2d 550,

557-58 (S.D.N.Y. 2005) ("[T]he record highlights the existence of several material questions of

fact regarding: (1) whether the ZBA's denial of the Application was, in fact, a complete denial

and therefore a substantial burden on WDS's religious exercise; and (2) even if the ZBA's denial

of the Application was not a complete denial, whether it nonetheless constitutes a substantial

burden on WDS's religious exercise.  Consequently, WDS's RLUIPA claim is not appropriate

for resolution via summary judgment, and these issues must be addressed at trial.").

> **E.**      **State Law Claims**

Defendants argue that Plaintiff's claims under New York state law "were not timely

commenced in an Article 78 Proceeding," and therefore, "are barred by the applicable statute of

limitations."  (Dkt. No. 36-9, p. 21).  In response, Plaintiff argues that its state law claims are not

time-barred because "the City effectively prevented Vision from obtaining a final determination

and thereby prevented Vision from obtaining Article 78 review."  (Dkt. No. 40, p. 21).

However, Plaintiff's state law claims for negligence, trespass, and wrongful demolition all relate

to the demolition itself, an event which surely constituted a final determination.  Since these

claims challenge the demolition after the fact, review could have been sought and obtained in an

Article 78 proceeding if brought within four months, as required by N.Y. C.P.L.R. § 217(1).

---

[7] Because there is an issue of fact as to substantial burden, the Court need not address whether the City acted in furtherance of a compelling governmental interest or whether its action was the least restrictive means of furthering that interest.

Because the demolition occurred on August 4, 2014, and thereafter Plaintiff did not file an Article 78 proceeding, and also did not commence this action until February 12, 2015, Plaintiff's state law claims are untimely and must be dismissed.[8] *See California Suites, Inc. v. Russo Demolition Inc.*, 946 N.Y.S.2d 55 (N.Y. App. Div. 1st Dept. 2012) ("Divested of its constitutional predicate, the complaint merely alleges that the municipal defendants failed to follow proper procedure in arriving at the determination to demolish the steel structure erected on the roof of plaintiff's premises and, in view of that omission, exceeded their authority in undertaking the demolition work.  As discussed, these issues must be raised in a special proceeding under CPLR article 78 . . . subject to a four-month statute of limitations.  Because this action was not commenced against the municipal defendants until seven months after the acts complained of, it is untimely and must be dismissed.") (internal citations omitted); *Fleet Mortg. Corp. v. City of Watertown*, 596 N.Y.S.2d 270, 271 (N.Y. App. Div. 4th Dept. 1993) ("Insofar as the first and second causes of action attack the actions of the City in demolishing the buildings . . . , review could have been sought and obtained in an article 78 proceeding if brought within four months as required by CPLR 217.  The buildings were demolished in January 1991 and the proceeding was commenced in October 1991, well beyond the limitation period.") (internal citation omitted).

## F.    Remaining Claims

Although Defendants appear to seek summary judgment on Plaintiff's claims for violation of the First Amendment right to free exercise of religion, violation of the Fourteenth Amendment right to Equal Protection, and violation of the Fair Housing Act, (Dkt. No. 36), they

---

[8] Thus, the Court need not reach the issue of whether Defendants are shielded from Plaintiff's state law claims by New York law, which "provides absolute immunity to state and local employees when they perform discretionary, as opposed to ministerial, functions." *Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d Cir. 1999) (distinguishing between qualified immunity relevant to constitutional claims and absolute immunity relevant to state law claims).

have not articulated any specific argument or basis for dismissal, save for qualified immunity, which is unavailing as discussed above. Accordingly, Defendants are not entitled to summary judgment on these claims.

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that the City Defendants' motion for summary judgment (Dkt. No. 36) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's claims against Defendants James Noble, William Carey, Deborah Brown, and Troy Ashdown are **DISMISSED**, and these individuals shall be terminated as defendants; and it is further

**ORDERED** that Plaintiff's claims under New York State law for negligence, trespass, and wrongful demolition are **DISMISSED**; and it is further

**ORDERED** that the City Defendants' motion for summary judgment (Dkt. No. 36) is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff's cross-motion for partial summary judgment (Dkt. No. 37) is **DENIED.**

**IT IS SO ORDERED.**

June 7, 2017
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

40